ATLAS PIPELINE CORPORATION et al.
v. FEDERAL TENDER BOARD NO. I
et al.

No. 8181.

Circuit Court of Appeals, Fifth Circuit.

Dec. 10, 1936.

J. N. Saye and W. T. Saye, both of Longview, Tex., for appellants.

Richard H. Hill, Sp. Asst. to Atty. Gen., and Steve M. King, U. S. Atty., of Beaumont, Tex., for appellees.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

Two causes, brought under the Connally "Hot Oil" Act,[1] one by Atlas to review and reverse orders of the Federal Tender Board declaring contraband and refusing clearances for two lots of East Texas oil, the other by the United States to enjoin Atlas and Hercules from handling contraband oil and products in interstate commerce, or otherwise engaging in practices forbidden by the act, were consolidated and heard as one. Appellants are here complaining of the decree sustaining the board and granting the injunction prayed. They insist that the orders refusing clearances were wrongly entered, for that neither of the lots they asked tenders for were contraband, and the injunction was unwarranted because there was no evidence that appellants had handled or would handle contraband oil, or were engaged or would engage in practices the Connally Act forbids.

The whole controversy grows out of the gathering by Hercules in its casing-head gas lines in the East Texas field, and the subsequent handling by it and Atlas of "scrubber oil" in quantities claimed to be excessive. By "scrubber oil," as used throughout the cause, is meant crude oil in small quantities, which, eluding the separator, passes with the gas and without being measured as oil, into the gas lines, where it is picked up in drip tanks placed at low points in the field, and also in the scrubbers at the plants.

It is not claimed that "scrubber oil," merely as such, is excess or waste oil and contraband. Indeed, it has all along been recognized in the practices and orders of the Railroad Commission, the statutory agent in Texas for the conservation of gas and oil, that some oil will inevitably and properly escape in this way unmeas-

[1] 15 U.S.C.A. §§ 715–715*l*.

ured into casinghead lines, and that when in reasonable quantities it may be picked up and handled in commerce. In the year before the tender applications in question here were made to the Federal Board, and up to December 8, of 1935, the commission recognized as not excessive and in practice allowed, intrastate tenders for "scrubber oil" collected in gas lines, at the rate of one barrel per well per month. On January 21, 1936, by order it declared excessive all accumulations of scrubber oil in excess of 75/100 of a barrel per well per month.

During the period from May 1, 1935, and up to February 21, 1936, Hercules accumulated "scrubber oil" in its lines from the approximately 1,200 wells to which it was connected, at the rate of 3.33 barrels per well per month, an amount greatly in excess of the amount the commission had found nonexcessive, and greatly in excess of the experience generally in the field. This amount as to the average 20-barrel well would be a production materially in excess of its allowable, and if occurring generally over the field would result in a very considerable overproduction.

Unable to obtain tenders from the commission for the entry into commerce of this "scrubber oil," in excess of the one barrel per month the commission allowed as nonexcessive, and having no storage facilities at its plant, Hercules from time to time applied to the commission for, and was granted, permission to deliver this excess "scrubber oil" to Atlas for storage. These permits, informal in character, and all issued in reliance upon Hercules' statement that it and Atlas would keep diligent records of such oil and file the usual reports with the commission as the rules and practices provided, all provided that the oil was for storage only, and that it was not to go into commerce. Under these informal permits, Hercules up to October 31st had delivered excess "scrubber oil" to Atlas as follows:

| | | |
|---|---:|---|
| In May, 1935 | 1833.26 | barrels |
| June, 1935 | 729.88 | " |
| August, 1935 | 1259.56 | " |
| September, 1935 | 2095.33 | " |

As a matter of fact, Atlas had no storage tanks. All of its tanks were working tanks, in constant use for receiving oil and sending it out in large quantities through its pipe lines. In each of the months mentioned, and in the months of October and November, there passed into and out of the tanks into which the "scrubber oil" was received, and into commerce, on duly approved tenders, more than 100,000 barrels of oil. Thus by December 1st, though at least an equivalent amount of oil was always kept on hand, all or substantially all of the actual "scrubber oil" which had been delivered into the tanks had been drawn out of them, to be replaced by other oil. The fact that this was so was discussed at a conference between Atlas, Hercules, and officers of the Federal Tender Board on or about December 9, 1935, and it was then stated that because it was, Atlas would not be deemed guilty of commingling legal allowable oil with excess "scrubber oil" if allowed to move additional legal oil into its tanks in future, and that federal tenders might be granted for the future movement of legal oil, no additional "scrubber oil" not covered by both state and federal tenders to be moved into the tanks. The 12,371.43 barrels of oil covered by the February 7 application for tender represents the balance of the legal oil covered by the December federal tender, but not shipped out in that month, and therefore requiring new tender.

Notwithstanding this agreement and understanding with the Federal Tender Board, Hercules applied for and obtained Railroad Commission permits to run "excess scrubber oil" "for storage only, and not to be moved in commerce," as it had done in the months of May, June, August, and September. Under these permits Hercules delivered and Atlas received in its working tanks "scrubber oil" as follows:

| | | |
|---|---:|---|
| December | 1809.79 | barrels |
| January | 2875.08 | " |
| February | 3310.11 | " |

As it had done in the previous months, Atlas received in and shipped out of those tanks in each of these months more than 100,000 barrels of crude oil. Thus on February 7 when Atlas applied for a certificate for the 12,371.43 barrels unshipped on the December federal tender, substantially all of the actual "scrubber oil" taken into had passed out of these tanks, and when on February 25 it applied for a tender for 13,003.01 barrels, all or substantially all of the "scrubber oil" received into the tanks in December and January had moved out of them while of the actual

"scrubber oil" received in February only a small part remained.

Appellants took the position below, they adhere to it here, that they have faithfully kept their agreement with the commission as to holding the "scrubber oil" in storage and not shipping it out, by retaining in the tanks at all times an amount of oil in excess of the amount of "scrubber oil" taken into them. It is admitted by all that at no time was the oil in the tanks reduced below an amount equivalent to the total number of barrels of excess "scrubber oil" which had been placed there for storage. Appellants did not make the point below as to the 13,000-barrel tender application, they do not claim here, that the actual "scrubber oil" has passed out of the tanks by delivery on allowed intrastate or federal tenders, and that the board is without power to treat the equivalent amount of legal oil retained as though it were itself illegal oil. They treat the matter throughout as though the original "scrubber oil" was still on hand. They insist, as to it, that it was not contraband, its movement prohibited under the act. They insist, too, that if it be considered so, its having been taken into the tanks does not render nontenderable other oil taken into them. As to the 12,000-barrel tender, then, they insist that if the "scrubber oil" was contraband, this oil is legal oil and tenderable. They say this was admitted by the board to be so in December, and a federal tender was granted as to it.

They say, further, that under our case, Federal Tender Board No. 1 v. Haynes Oil Corp., 80 F.(2d) 468, it is tenderable because it is legal oil, commercially and therefore legally, separable from any illegal oil which may be or have been in the tanks where it is now found.

Appellees prevailed below upon the theory that the 13,003.01 barrels applied for had gone into the tanks as excess "scrubber oil" and therefore contraband oil, and that being contraband it was not movable in interstate commerce. That the 12,000 barrels of oil was not movable, because it had become so mixed with the "scrubber oil" as that the "scrubber oil" became a constituent of it, rendering it nonmovable. Admitting that the board had given a tender for it in December which expired unused, they seek to avoid the effect of that tender by pointing out that in violation of the understanding Hercules thereafter delivered additional excess "scrubber oil" into the Atlas tanks. They seek to differentiate the Haynes Case by pointing to the proof that what was delivered by Hercules to Atlas was not whole "scrubber oil" but "scrubber oil" after it had been topped for gasoline. They argue that having been run into the Atlas tanks and there mingled with other oil, which had not been topped, it there became inextricably commingled so that it became within the meaning of the act, a constituent part of each barrel of legal oil in or afterwards run into or through the tanks.

Assuming that the "scrubber oil" as originally run into the tanks was contraband, we do not think the fact that it was topped before being run in will suffice to distinguish this case from the Haynes Case. It is evident, from the commercial practice of Atlas in handling this "scrubber oil" without distinction in the same tanks with its other oil, that it was for all purposes capable of being, and it was, taken into commerce as the same in substance as the other oil run into and through the tanks. There is no proof that for commercial purposes it was not in substance the same.

We think it plain that there is no more physical or legal difficulty attending the drawing of 12,000 barrels of legal oil out of the tanks in question here than there would be if none of the "scrubber oil" had been topped. Besides, to hold, under the facts of this case, that the running of a few thousand barrels of "scrubber oil" into and through Atlas' tanks and lines had contaminated and permanently polluted those tanks and lines so as to make all oil later run into them contraband, would be to view the acts invoked here, both state and federal, through microscopic lenses, and thus to take too small a view of the broad, the practical, the workable purpose of the Texas conservation laws and the federal laws in aid of them; a narrow view which, if meticulously followed out in the East Texas field, would introduce such complete and utter confusion as to defeat their practical purpose and working. When it is considered that during the ten months in question there has been a commingling of only 13,903 barrels of topped "scrubber oil" with and a drawing off of nearly one million barrels of crude, and when it is further considered that in each of the months from May to November, inclusive, oil was drawn out of the tanks indiscriminately, it would plainly appear that there never

was left in the tanks at the end of any month a substantial amount of the actual "scrubber oil" put there in that month. It further plainly appears as all parties here recognized, that by December 1st the amount of actual "scrubber oil" remaining in the tanks was too infinitesimal to take account of.

As to that put in in December, in January, and in February, the same process of reasoning shows how small a part of it was there on February 7, when the first application was made, and again on February 25, when the second was. To construe and apply the conservation laws so as to hold a stream of legal oil amounting in the ten months to over 1,000,000 barrels polluted by the small infusion of 13,000 barrels of "scrubber oil" taken in in small quantities from time to time and thus to condemn 12,000 barrels of admittedly legal oil, would be as complete a reductio ad absurdum as to condemn the tanks and all the oil that had ever been, or would ever be, placed in them because a small amount of contraband had from time to time been run through them. We therefore reject, as entirely without merit, the claim that by polluting them by mingling them with "scrubber oil" the 12,000 barrels from admittedly legal sources have been made contraband.

As to the 13,000-barrel application still assuming that the "scrubber oil" when run through the tanks was contraband, the case is more difficult.

If we should look at the matter as it really and physically is, and not as appellants have cast it by their agreements and conduct, we would be bound to find that the 13,000 barrels applied for are no more contraband than the 12,000 barrels, because the actual amount of contraband oil in each barrel of legal oil would be so small as to defy detection, or if detected, as to be de minimis. We think, however, that the case is, as to the 13,000 barrels, the equivalent of "scrubber oil," an appropriate one for the application of that kind of estoppel which holds one dealing with public authorities to a position he has taken with them when to permit him to abandon it, would permit him to take advantage of his own wrong. Stearns Co. v. United States, 291 U.S. 54, 54 S.Ct. 325, 78 L.Ed. 647; Rose v. McEachern (C.C.A.) 86 F. (2d) 231. We think that appellant Atlas, having agreed that it would hold the "scrubber oil" in storage and would not put

it in commerce, should be held now estopped when it asks a tender for an equivalent amount, from saying that it is not the very "scrubber oil" it put in storage and agreed to keep there.

As to the 13,000 barrels itself, therefore, we consider and treat it as "scrubber oil," and taking it that way, we agree with the finding of the court that there was no abuse of discretion in refusing to reverse the board for refusing a tender for it. The statutes of Texas prohibit the drawing from wells of more oil than the amount allowed to them. They require all oil and gas drawn from wells to be measured. Theoretically, every bit of oil which passes out of the oil line and into the gas line unmeasured is illegal oil, that is, oil in excess of the amount allowed for that well. Practically within the limits of a tolerance which standards of prudent, non-wasteful operation permit, such escaped oil is not illegal. But theoretically and practically, escaping oil in quantities as large, as excessive, as disproportionate, as unusual as those involved in this case, is oil produced in excess of the allowable, and is and should be held to be contraband.

The decree of the trial court on the petition for review was therefore wrong as to the requested 12,371.43-barrel tender, right as to that for the 13,003.01 barrels.

As to the injunction, we think it plain that though we have held it estopped on its application for tender to claim that it has done so, Atlas has in fact actually transported in interstate commerce, the excess "scrubber oil" it received into its tanks, and in doing so has actually, if not intentionally violated the Connally Act. We think it plain, too, that Hercules has, contrary to the act, shipped interstate, gasoline, obtained from topping this excess and therefore illegal "scrubber oil," and that an injunction should properly issue against them both, restraining them in regard to these practices. We think it equally plain, however, that as drawn the injunction is too broad in its terms and without pleading or proof to support it. The only violations complained of in the petition were the illegal handling of excess "scrubber oil" and of gasoline obtained by topping it. The only violations the proof showed as occurring or likely to occur were with reference to excess "scrubber oil". The injunction should have been so limited.

The decree appealed from will therefore be reversed, with directions to the court below to enter its decree in accordance herewith, granting the petition for review and directing issuance of clearances as to the 12,371.43-barrel application, denying it as to the 13,003.01-barrel tender, and granting an injunction limited to specific practices in regard to "scrubber oil" of the kind complained of and proven.

Reversed and remanded, with directions.